# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 07-22326-CIV-DIMITROULEAS/ROSENBAUM

JELD-WEN, INC., an Oregon corporation,
individually and as assignee of the claims of
Cardinal IG Company, a Minnesota
corporation,

               Plaintiff,

v.

NEBULA GLASSLAM INTERNATIONAL, INC.,
d/b/a "GLASSLAM" and "N.G.I., INC.," a
Florida corporation, and REICHHOLD, INC.,
a Delaware corporation, and STEPHEN HOWES,

               Defendants.

_____/

## <u>ORDER</u>

### *I.  INTRODUCTION*

      This matter comes before the Court upon Plaintiff Jeld-Wen, Inc.'s Motion to Compel Defendant Reichhold to Respond to Jeld-Wen's Request for Production of Agreements Between Reichhold and Glasslam ("Jeld-Wen's Motion").  [D.E. 104].  The Court has carefully reviewed Jeld-Wen's Motion, all responsive and supporting filings thereto, the record in this case, and has heard argument of counsel at a hearing held on February 4, 2008, as well as at an *ex parte* hearing involving Defendants Reichhold and Glasslam on February 14, 2008.  Additionally, the Court is otherwise fully advised in the premises and, for the reasons articulated below, now grants in part and denies in part Jeld-Wen's Motion.

## II.  BACKGROUND

The undersigned has previously set forth significant portions of the factual and procedural background of this case recited below.  *See, e.g.,* D.E. 146.  Because this background is necessary to understanding the Court's ruling in this Order, however, the Court once again recounts the relevant facts here for convenience.

### A.  Factual Background

In this case, Plaintiff Jeld-Wen, Inc. ("Jeld-Wen"), an Oregon corporation, sues Defendants Reichhold, Inc. ("Reichhold"), a Delaware corporation, Nebula Glass International, Inc. ("Glasslam"), a Florida corporation, and Stephen Howes, the owner of Glasslam.  D.E. 109-2, ¶¶1-4. Although the Second Amended Complaint alleges twenty different counts, the nucleus of facts giving rise to all of these claims centers around the delamination and yellowing of hurricane impact resistant glass sold by Plaintiff Jeld-Wen.

More specifically, Jeld-Wen entered into a contract with Glasslam under which Glasslam sold Jeld-Wen certain resin and other glass products and licensed to Jeld-Wen Glasslam's patented process of producing impact resistant glass, called Safety Plus 1 glass ("Safety Plus").  Jeld-Wen then manufactured windows and doors containing hurricane impact resistant glass made through the Safety Plus creation process, which involved sandwiching together a piece of glass, resin, a thin piece of polyethylene terephthalate polyester ("PET") film, more resin, and another piece of glass. When prepared properly with effective ingredients, the impact resistant glass was supposed to function for at least ten years.  Instead, however, Jeld-Wen's customers began experiencing Safety Plus failures in the form of delamination and discoloration of the glass well before ten years after installation had elapsed.

As it turned out, the resin Glasslam sold to Jeld-Wen was defective in that it either did not contain any ultraviolet light blocker, or it contained too little or ineffective versions of ultraviolet light blocker. Additionally, the resin had not been cooked to the proper temperature. Consequently, sunlight on the Safety Plus glass could cause the resin to fail, resulting in delamination and discoloration. Glasslam purchased the resin it sold to Jeld-Wen from Defendant Reichhold, which manufactured the product.

**B.  The Procedural History**

1.  *Glasslam I*

Upon receiving complaints about delamination and discoloration from customers other than Jeld-Wen, Glasslam investigated and discovered the problems with Reichhold's resin. *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1206 (11th Cir. 2006) ("*Glasslam I*"). Thus, in 2002, Glasslam filed suit against Reichhold for damages sustained as a result of Reichhold's defective resin. *Id*. The case fell to Judge Dimitrouleas, within this Court.

Before trial, this Court limited Glasslam to presenting at trial any future replacement claims unrelated to any of the specific customer complaints Glasslam had identified in its Rule 26, Fed. R. Civ. P., disclosures and interrogatory answers. Accordingly, at the trial, this Court instructed the jury as follows: "Glasslam may only seek to recover damages for those specific claims which have been presented to you during this trial. You should not consider at this time any damages for future claims which have not been specifically presented in this trial." *Id.* at 1209. The jury returned a verdict of $22,500,000.00 for Glasslam, which was comprised of $1,271,379.00 in out-of-pocket damages, $14,665.621.00 in unpaid customer claims, and $6,563,000.00 in lost profits. *Id.* at 1207. On appeal, the Eleventh Circuit affirmed the judgment.

2.  *Glasslam II*

Following the conclusion of *Glasslam I*, Glasslam filed a second lawsuit against Reichhold in Case No. 05-60704-CIV-DIMITROULEAS (S.D. Fla.) ("*Glasslam II*").  In that action, Glasslam sought compensation for damages incurred as a result of Reichhold's defective resin, relating to glass not claimed in *Glasslam I*.  Towards this end, Glasslam alleged six counts in its complaint, including the following three: breach of contract (Count I), breach of express warranty (Count II), and breach of implied warranty (Count III).

In its Order on the parties' cross-motions for summary judgment, the Court held that Reichhold was collaterally estopped from re-litigating the breach-of-duty elements of Counts I, II, and III.  *Glasslam II*, D.E. 108, p. 14.  Rather, the ultimate fact determined in *Glasslam I* – that Reichhold's resin was defective – could not be disturbed and continued to bind the parties.  *Id.* "Whether the defective resin was the proximate cause of the particular claims for the particular windows" at issue in *Glasslam II*, however, was not litigated, and, thus, remained for trial.  *Id.* at p. 16.

Instead of proceeding to trial, however, the parties settled the matter and entered into a stipulation of dismissal with prejudice.  *Glasslam II*, D.E. 132.  Accordingly, the Court dismissed the action with prejudice.  *Glasslam II*, D.E. 134.

3.  *Jeld-Wen I*

Before Glasslam and Reichhold settled *Glasslam II*,  Jeld-Wen sued Glasslam, among others, in Case No. 05-60860-CIV-DIMITROULEAS (S.D. Fla.) ("*Jeld-Wen I*").  Glasslam then filed a third-party complaint against Reichhold in that action.  *Jeld-Wen I*, D.E. 32.

In *Jeld-Wen I*, Jeld-Wen alleged seven counts against Glasslam, including the following

three:  breach of contract (Count I), breach of express warranty (Count II), and breach of implied warranty of merchantability (Count III).  *Jeld-Wen I*, D.E. 1.  Glasslam, in turn, alleged eight claims against Reichhold, including, among others, breach of contract (Count I), breach of express warranty (Count II), breach of implied warranty (Count III), and indemnification (Count VI).  *Jeld-Wen I*, D.E. 305, p. 6.   In its Answer to Glasslam's Third-Party Complaint, Reichhold expressly denied Glasslam's claims of breach of contract, breach of express warranty, breach of implied warranty, and indemnity, as well as Glasslam's allegations that Glasslam had suffered damages "[a]s a direct and proximate result of Reichhold supplying defective resin to Glasslam."  *See Jeld-Wen I,* D.E. 39, ¶¶ 28, 33, 38, 45, 96.

Trial in *Jeld-Wen I* began on June 11, 2007.  *Jeld-Wen I,* D.E. 341.  Also as of that date, Defendant Glasslam and Third-Party Defendant Reichhold entered into an agreement noted in the document as being "made and entered into on [the] 11th day of June, 2007"[1] ("June 11th Agreement").  Reichhold and Glasslam have since described the June 11th Agreement as a "[j]oint [d]efense and [i]ndemnity [a]greement."  *Jeld-Wen II,* D.E. 118, p. 1.

On June 26, 2007, the jury concluded that defective resin that Glasslam supplied Jeld-Wen served as a legal cause of damages sustained by Jeld-Wen for breach of contract, breach of express warranty, and breach of implied warranty of merchantability.  *Jeld-Wen I*, D.E. 362.  On the other hand, in considering the amount of "legally caused damages" with respect to each of the 77 individual houses containing Jeld-Wen windows at issue, the jury declined to award any damages at all for 46 of the homes.  *Id.* at 2-6.  As for the remaining 31 houses, the jury awarded a total of

---

[1]The actual signature date of the Glasslam representative is June 13, 2007, although the Reichhold representative's signature is dated June 11, 2007.

more than $1 million in damages.  *Id.*

       4.  *Jeld-Wen II*

      As *Jeld-Wen I* did not address Jeld-Wen's claims for damages regarding windows for which inspections, repairs, and replacements had not been completed by the close of discovery in *Jeld-Wen I*, on September 5, 2007, Jeld-Wen filed the instant case to seek damages for windows in which it utilized Glasslam's Safety Plus method and Reichhold's resin, which were not considered during the course of *Jeld-Wen I*.  In this case, Jeld-Wen again alleges, among other claims, breach of contract (Count I), breach of implied warrant of merchantability (Count II), and breach of implied warranty of fitness for a particular purpose (Count III).  D.E. 112-1.

      During discovery, Jeld-Wen served Reichhold with a request for production seeking "documents that provide evidence of any 'agreements, mutual understandings and/or contracts' between Glasslam and Reichhold entered into between January 1996 and the present."  D.E. 104, p. 1.  Reichhold objected and instead produced a privilege log identifying the June 11th Agreement from *Jeld-Wen I* and entries for "correspondence" relating to that Agreement.  *Id.* at 2.

      In response, Jeld-Wen filed the pending Motion to Compel Reichhold to disclose the June 11th Agreement and the correspondence pertaining thereto.  D.E. 104.  In support of its Motion, Jeld-Wen argues that the Agreement "may provide impeachment evidence for use in this case, as well as evidence to assist in rebutting Glasslam's and Reichhold's defenses."  *Id.* at 2.  Jeld-Wen further suggests that the Court should grant its Motion "because such information may be needed for Jeld-Wen's appeal of the verdict in *Jeld-Wen I*."  *Id.* at 3.

      To rebut Jeld-Wen's argument, Reichhold asserts that the June 11th Agreement constitutes communications between Glasslam and Reichhold that are privileged and protected by the work

product privilege and the joint defense doctrine.  D.E. 118.  Reichhold also objects to Jeld-Wen's attempts to employ discovery in the instant case to obtain evidence for use in a different case (*Jeld-Wen I*).  *Id.*

On February 4, 2008, the Court heard oral argument on Jeld-Wen's Motion.  D.E. 125.  During that hearing, the Court ordered Reichhold to produce *ex parte* to the Court a copy of the June 11th Agreement.   Following the hearing, on February 6, 2008, Jeld-Wen filed its List of Considerations Concerning the *In Camera* Review of Defendants' "Joint Defense/Indemnity Agreement" ("Jeld-Wen's List").  D.E. 132.  Arguing that Jeld-Wen's List of Considerations urged new contentions that Jeld-Wen had not previously made, Reichhold moved to strike Jeld-Wen's List. D.E. 141.

On February 12, 2008, the Court received a copy of the Agreement in question from Reichhold.  After reviewing the June 11th Agreement, the Court entered an Order setting an *ex parte* hearing for February 14, 2008, for only Defendants to attend.  D.E. 144.  The Court also denied Reichhold's Motion to Strike.  D.E. 145.

At the February 14th hearing, the Court provided Reichhold and Glasslam with an opportunity to address new considerations raised by Jeld-Wen in its List.  Additionally, the Court, in an Order memorialized on February 15, 2008, directed Reichhold to submit supplemental briefing regarding Reichhold's contention that the June 11th Agreement is privileged.  D.E. 149.  With respect to the issue of the relevance to the current case of the June 11th Agreement, which, by its terms applies only to *Jeld-Wen I*, the Court ordered the parties to provide supplemental briefing.  *Id.*

Accordingly, on February 22, 2008, Jeld-Wen, Reichhold, and Glasslam each submitted their respective supplemental briefs.  D.E. 173 (Reichhold's relevance brief), 174 (Glasslam's relevance

brief), 175 (Jeld-Wen's relevance brief), 181 (Glasslam's privilege brief), 191 (Reichhold's privilege brief).  The Court now considers the arguments raised by each party.

### III. ANALYSIS

#### A.  The Nature of the June 11th Agreement

Before turning to the parties' assertions in favor of and against disclosure of the June 11th Agreement, the Court must first examine the document to identify the appropriate characterization of it.  Such an analysis may necessarily determine any entitlement Defendants have to the protections of privilege with respect to the June 11th Agreement or any portions thereof.

In this regard, the Court notes that Defendants have described the Agreement as a joint defense and indemnity agreement.  Defendants' characterization, however, does not end the inquiry.  *McNally Tunneling Corp. v. City of Evanston*, 2001 WL 1246630, *1 (N.D. Ill. Oct. 18, 2001) ("*McNally*") (citing *Tribune Co. v. Purcigliotti*, 1997 WL 540810, *3 (S.D.N.Y. Sept. 3, 1997)).  Rather, the Court may engage in and has, in fact, undertaken its own *in camera* review of the June 11th Agreement to enable it to make an independent determination regarding the nature of the Agreement.  *See id.*

Agreements may serve more than one purpose and may contain more than one agreement within them.  *McNally* provides an illustration of how this works.  In that case, the City of Evanston ("Evanston") contracted with McNally Tunneling Corporation ("McNally") to provide services in connection with a sewer project.  Evanston also entered into a contract with Harza Environmental Services ("Harza") to serve as the lead engineer and Evanston's representative on the project.  When the parties were unable to resolve their differences regarding problems that arose during the performance of the contractual duties, McNally filed suit against Evanston for breach of contract.

Instead of bringing Harza into the case as a third-party defendant, Evanston entered into an agreement with Harza, portions of which had the effect of settling Evanston's claims against Harza and other parts of which related to Evanston and Harza's intentions to cooperate in defending McNally's claims.  During the course of litigation, McNally sought the agreement entered into between Evanston and Harza, which Evanston and Harza described as a joint-defense agreement, and McNally labeled a settlement agreement.

The court engaged in its own review of the document.  Recognizing that Evanston could have chosen to bring Harza into the case as a third-party defendant, the court noted that through the agreement Evanston instead decided to settle with Harza.  In this regard, the court characterized the provisions settling the case as a "settlement agreement."  Additionally, the court found that components of the agreement consisted of joint defense provisions addressed at cooperating in defending against McNally's claims.  The court deemed these paragraphs a "joint-defense agreement."  Thus, although the agreement at issue in *McNally* accomplished both the purposes of settlement and joint defense in a single document, the court found the settlement and joint-defense portions of the agreement to be segregable and, thus, analyzed the agreement as two separate documents, within the separate framework applying to each such document.  In making this decision, the court concluded that the paragraphs of the document resolving Evanston and Harza's adverse interests constituted a settlement agreement, while the aspects of the document focusing on Evanston and Harza's common interests of Evanston and Harza's joint strategy for defending McNally's lawsuit comprised a joint-defense agreement.  *McNally*, 2001 WL, 1246630 at *3.  Based on these findings, the court ordered production of the paragraphs of the agreement relating to settlement, but protected the joint-defense portions from disclosure.

The Court recognizes that agreements accomplishing more than one purpose may not always be broken apart neatly into two or more discrete agreements.  Sometimes, the provisions are so intertwined that the Court must determine that the document serves one overriding purpose instead of functioning as two separate agreements.  *See, e.g., Developers Surety and Indemnity Co. v. Harding Village, Ltd.*, 2007 WL 2021939 (S.D. Fla. July 11, 2007).  That, however, is not the case here.  The June 11th Agreement does not contain joint-defense provisions that are so intertwined that the document may accurately be found to serve one overriding purpose.  Rather, the instant case involves an agreement more akin to the one at issue in *McNally*, as joint-defense portions of the Agreement are segregable from those that pertain to settlement.

More specifically, the Court finds that prior to their entry into the June 11th Agreement, Glasslam and Reichhold had adverse interests with respect to the issue of indemnity.  Indeed, Glasslam filed a Third-Party Complaint over this issue, and Reichhold denied the allegations that would have resulted in its liability.  It is difficult to conceive of a better illustration of adverse legal interests than a pending lawsuit between two parties on the very issue for which the parties ultimately entered into a settlement agreement.  Paragraphs 1 and 8 of the June 11th Agreement effectively settled the parties' adverse interests as they related to issues of indemnity, including attorney's fees, in *Jeld-Wen I*.  In this regard, paragraph 1 binds Reichhold to pay the judgment entered against Glasslam in *Jeld-Wen I*.  Similarly, paragraph 8 obligates Reichhold to indemnify Glasslam for certain portions of attorney's fees incurred in Glasslam's defense of *Jeld-Wen I*.  As paragraphs 1 and 8 constitute terms settling the dispute between two adverse parties and do not divulge defense strategies or theories, these paragraphs cannot be cloaked with immunity from disclosure as a joint-defense agreement.

While Defendants urge that their decision to set aside their differences to concentrate their efforts against Jeld-Wen in *Jeld-Wen I* somehow morphs what are otherwise clearly settlement terms into joint-defense provisions protected by the common interest doctrine, the Court disagrees. Defendants rely on *Visual Scene, Inc. v. Pilkington Bros., PLC.,* 508 So.2d 437 (Fla. 3rd D.C.A. 1987), to support their argument. In *Visual Scene*, VSI, a distributor of sunglasses, sued Pilkington, Chance, and Metro, alleging that Chance supplied defective photochromic glass blanks to Metro and that Metro negligently processed the glass. Pilkington and Chance maintained that the lenses were not defective, but that they were negligently processed and stored by Metro, and that VSI exacerbated any problems by improperly handling the finished sunglasses. Metro took the position that the glass supplied by Chance was defective and that Metro was not negligent. In this regard, VSI and Metro shared the theory that glass manufactured by Chance was defective, although VSI continued to prosecute its claim that Metro was negligent in processing the glass supplied by the other defendants.

Pilkington and Chance sought documents recounting communications concerning the litigation between VSI and Metro. The Third District Court of Appeal, however, concluded that the common interest doctrine protected such documents from disclosure. In making this determination, the court found it significant, among other factors, that VSI and Metro had exchanged the information at issue "'for the limited purpose of assisting in their common cause.'" *Visual Scene*, 508 So.2d at 441-42 (quoting *In re LTV Securities Litigation*, 89 F.R.D. 595, 603-04 (N.D. Tex. 1981)). Notably, *Visual Scene* did not involve documents relating to the settlement of claims, but rather, to communications regarding the parties' common defense. The Court does not dispute the applicability of the common interest doctrine under such circumstances.

The same, however, cannot be said about paragraphs 1 and 8 of the June 11th Agreement. Even assuming, *arguendo*, that Glasslam and Reichhold's settlement of Glasslam's claims against Reichhold may have had the side effect of assisting Defendants in their common cause of defending against Jeld-Wen's claims in *Jeld-Wen I* by clearing the way for Defendants to cooperate in their defense against Jeld-Wen, there is simply no getting around the fact that paragraphs 1 and 8 constitute settlement arrangements for the indemnification issue for which Glasslam and Reichhold were, until entry into the agreement, entirely adverse in *Jeld-Wen I*. Consequently, these paragraphs cannot accurately be described as having been entered into for the *limited* purpose of assisting in Defendants' joint defense in *Jeld-Wen I*. Moreover, unlike paragraphs 2 through 7 and 9 of the June 11th Agreement, nothing about paragraphs 1 and 8 appears to the Court to discuss, document, or otherwise refer to Defendants' joint-defense *strategies* in *Jeld-Wen I*. Instead, the Court finds this case to be on all fours with *McNally*,[2] and, as in that case, the purpose of paragraphs 1 and 8 rests firmly in resolving the adverse legal interests between Glasslam and Reichhold. Thus, the Court considers paragraphs 1 and 8 of the June 11th Agreement to be a settlement agreement.

---

[2]Defendants assert that *McNally* is distinguishable from the pending case in that Harza had not been brought into *McNally* as a third-party defendant at the time that Harza entered into the settlement aspects of the agreement with Evanston. The Court views this as a distinction without a difference. The fact that Evanston had not actually sued Harza at the time that it entered into the settlement agreement with Harza neither makes the two parties' interests more or less adverse than if Evanston had sued Harza first; the claims existed, regardless. Nor does it lessen Harza and Evanston's common interests in minimizing damages found against Evanston that could ultimately be passed through to Harza. Indeed, the parties entered into the settlement agreement instead of Evanston's filing of a third-party complaint against Harza. As such, Evanston simply skipped the step that Glasslam took of bringing Reichhold in as a third-party defendant before agreeing to settle its claims with Harza. *McNally*'s holding rests on the lynchpin that Evanston and Harza no longer had an incentive to blame each other for the alleged breach of contract for which they entered into the settlement agreement. Precisely the same holds true here for Glasslam and Reichhold.

Paragraphs 2 through 7, and 9 of the June 11th Agreement, on the other hand, just as plainly relate to Reichhold and Glasslam's joint-defense strategy.[3]   Accordingly, the Court finds these paragraphs of the June 11th Agreement to constitute a joint-defense, or pooled interest, agreement.

## B.  The Discoverability of the June 11th Agreement

Having determined the nature of the June 11th Agreement, the Court now turns to Jeld-Wen's demand for disclosure and Defendants' objections.

### 1.  The Settlement Provisions of the June 11th Agreement

Rule 26(b), Fed. R. Civ. P., sets forth the permissible parameters of discovery.  Under that rule,

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . [that] appears reasonably calculated to lead to the discovery of admissible evidence . . . , [as long as the Court does not find that] (i) the discovery sought is unreasonably cumulative or duplicative, or . . . obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. . . ."

R. 26(b), Fed. R. Civ. P.  The Advisory Committee Notes to Rule 26 indicate that "[t]he purpose of discovery is to allow a **broad** search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case."  Adv. Com. Notes, 1946 Amendment, R. 26, Fed. R. Civ. P. (citations omitted) (emphasis added).  Indeed, the Advisory Committee Notes

---

[3]Paragraph 10 of the June 11th Agreement contains language defining the date of effectiveness of the Agreement.  As such, the Court considers this paragraph to apply to both the settlement and joint-defense aspects of the June 11th Agreement.

approvingly cite language from a case stating that "the Rules . . . permit 'fishing for evidence as they should.'" *Id.* (citation omitted).

The courts have long recognized the wide scope of discovery allowed under the Federal Rules of Civil Procedure.  As the Eleventh Circuit's predecessor court noted,

> The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies.  The United States Supreme Court has said that they are to be broadly and liberally construed.

*Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973)[4] (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *Schlagenhauf v. Holder*, 379 U.S. 104, 114-115 (1964)).  Of course, the scope of permissible discovery is not unbounded.  Requested discovery must be relevant, and it must not impose undue burden, under the tests described in Rule 26(b)(2)(c).

Thus, for the Court to consider permitting discovery of the settlement provisions of the June 11th Agreement, Jeld-Wen must demonstrate that the information sought is "relevant," as Rule 26 defines the term.  With respect to the settlement provisions, Jeld-Wen argues that they are relevant as impeachment evidence demonstrating Howes's financial incentive to testify favorably to Reichhold, "as it pertains to Howes'[s] bias and motive to exaggerate." D.E. 175 at 6.  In particular, Jeld-Wen asserts, the Agreement "tends to show that Howes has an incentive to take Reichhold's side in this litigation."  *Id.* at 7.  In explaining the significance to the pending case of the June 11th Agreement, which does not purport to pertain to the matters at issue in the current case, but rather, addresses the *Jeld-Wen I* litigation, Jeld-Wen argues,

---

[4]Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

> Howes has already testified in one trial, after being promised that Reichhold would pay the verdict. Now, having given testimony under oath in one proceeding, his testimony in this trial will certainly be congruent with the testimony he gave there, testimony that may well have been affected by the promise of indemnity. Thus, even though this will be a separate trial from *Jeld-Wen I*, the issues in this trial will be virtually identical, the subject matter of Howes['s] testimony will be virtually identical, and Howes'[s] testimony in this trial will unquestionably be affected by the testimony he gave in *Jeld-Wen I*, testimony he gave after having been promised indemnity by Reichhold.

*Id.* Jeld-Wen also contends that to the extent that the June 11th Agreement includes a "provision compensating Glasslam's counsel for all (or some) of his work in *Jeld-Wen I*," such an additional benefit provides further motivation for Howes to have given testimony favorable to Reichhold in *Jeld-Wen I*, thus, effectively confining the bounds of Howes's testimony in the instant matter. *Id.* at 8.

Reichhold responds that regardless of the existence of any agreement to indemnify Glasslam for any verdict against it in *Jeld-Wen I*, the law required Reichhold to provide such indemnification as a result of the holding in *Glasslam I* that Reichhold's resin was defective. D.E. 173, p. 3. Consequently, Reichhold reasons, an agreement to indemnify Glasslam could not have provided an incentive for Howes to have testified more favorably towards Reichhold than he would have otherwise been inclined. *Id.* Moreover, even if Howes had a financial incentive to color his testimony in favor of Reichhold, Reichhold asserts, that impeachment evidence would, at most, be relevant only to *Jeld-Wen I*, not the case at hand. *Id.* Glasslam makes a similar argument. D.E. 174, p. 3.

The Court agrees with Jeld-Wen. While the law would have required Reichhold to indemnify

Glasslam for damages to Glasslam determined under the law to be caused by Reichhold's defective resin, whether Reichhold's resin caused Glasslam's liability constituted one of the very questions at issue between Reichhold and Glasslam in *Jeld-Wen I*. Indeed, in its Answer to Glasslam's Third-Party Complaint, Reichhold expressly denied Glasslam's claim of indemnity and its allegations that Glasslam had suffered damages "[a]s a direct and proximate result of Reichhold supplying defective resin to Glasslam." *See Jeld-Wen I*, D.E. 39, ¶¶28, 33, 38, 45, 96. Furthermore, the verdict form required the jury to determine whether Reichhold's resin served as a "legal cause of damages" Glasslam sustained when the jury ruled against it on Jeld-Wen's breach of contract, express warranty, and implied warranty counts. *Jeld-Wen I*, D.E. 362, p. 6.

Nor, as Reichhold and Glasslam suggest, does the fact that the June 11th Agreement relates only to *Jeld-Wen I* deprive the Agreement of any relevance to the instant case. As Jeld-Wen points out, one could fairly expect Howes, having already testified extensively during the course of *Jeld-Wen I* following the entry of the June 11th Agreement, to feel confined to testify consistently in the current case with his statements in the prior one. While it may well be the case that Howes did not allow the June 11th Agreement to color his testimony in any way in *Jeld-Wen I* and that Howes would testify in precisely the same way in *Jeld-Wen II* as he did in *Jeld-Wen I* because he views it as the truth, such a determination is not for the Court to make. Rather, the issue before the Court concerns whether the June 11th Agreement could reasonably be viewed as providing potential impeachment evidence relating to possible ulterior motives for Howes's testimony.

As this Court noted in *Jeld-Wen I*, impeachment evidence provides "a classic example of the type of evidence that should be discoverable in litigation." *Jeld-Wen I*, D.E. 315, at 4 (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). Indeed, the Federal Rules of Evidence anticipate

impeachment at trial.  *See, e.g.,* Fed. R. Evid. 611(b) (permitting cross-examination on "matters affecting the credibility of the witness").   And the Supreme Court has recognized that a demonstration of bias, an interest in the outcome of the litigation, or a motive to testify in a certain way all constitute potentially fertile and permissible areas of impeachment.  *See United States v. Abel*, 469 U.S. 45, 49-52 (1984).  Thus, Jeld-Wen's showing that information contained in the June 11th Agreement could reasonably be found to demonstrate bias on the part of Howes in the instant case suffices to bring the June 1lth Agreement within the definition of "relevance" dictated by Rule 26, Fed. R. Civ. P., for discovery purposes.[5]

Because the Court finds the settlement aspects of the June 11th Agreement to be relevant within the meaning of Rule 26, Fed. R. Civ. P., the Court addresses Defendants' specific claims of privilege with respect to those provisions.  As noted previously, Defendants assert first that paragraphs 1 and 8 are part of a pooled information agreement, and, as such, find protection in common interest doctrine.  Because, for the reasons discussed earlier in this Order, the Court concludes that paragraphs 1 and 8 cannot accurately be characterized as subject to the common interest doctrine, but rather, constitute a settlement agreement, the Court must decline Defendants' invitation to shield these paragraphs from disclosure on this basis.

Glasslam further suggests that the information contained in paragraph 8 of the June 11th Agreement is independently protected by the attorney-client privilege between Glasslam and its counsel.  D.E. 181 at 4.  In support of this contention, Glasslam suggests that "[i]n order to use [the information contained in paragraph 8] to its advantage, Jeld-Wen would have to also know the

---

[5]Of course, the Court's ruling that paragraphs 1 and 8 of the June 11th Agreement are discoverable does not equate to a determination that they are admissible at trial.

agreement between Glasslam and its counsel." Hence, Glasslam argues that allowing production of paragraph 8 would open a Pandora's Box with respect to attorney-client-privileged communications between Glasslam and its counsel. The Court has carefully reviewed paragraph 8 and cannot agree. While Jeld-Wen may desire more information than that contained within paragraph 8, that fact does not render paragraph 8 necessarily useless to Jeld-Wen nor unfairly prejudicial to Glasslam. The Court can adequately protect Glasslam from any invasion of the attorney-client privilege while also allowing Jeld-Wen to obtain otherwise discoverable information. The Court finds paragraph 8 to be self-contained and self-explanatory. That privileged information that is not accessible to Jeld-Wen may shed additional light on the actual impact of paragraph 8 on Defendants does not present a reason to protect paragraph 8 from disclosure.

## 2.  The Joint-Defense Provisions of the June 11th Agreement

Next, Jeld-Wen urges the Court to find as relevant any aspects of the June 11th Agreement pertaining to cooperation. D.E. 175, pp. 8-9. In this regard, Jeld-Wen argues that it is entitled to know whether Howes forewent any trial strategy or otherwise "'pulled any punches'" he had against Reichhold in *Jeld-Wen I*. *Id.* at 8-9. According to Jeld-Wen, such information provides impeachment evidence for Howes, showing Howes's alleged "bias and motivation for his exaggerated and inaccurate characterization of Jeld-Wen and its products, as well as provid[ing] substantive evidence for Jeld-Wen's innocent misrepresentation claim." *Id.*

The Court has thoroughly reviewed the remaining paragraphs of the June 11th Agreement. While the Court disagrees with Jeld-Wen that anything contained within the Agreement would be of relevance to its innocent misrepresentation claim, the Court acknowledges that paragraphs 2 through 7 and 9 comprise Defendants' pooled information agreement. As such, they touch on

Defendants' trial strategies.  Without addressing the particular provisions at issue in the June 11th Agreement, it would be difficult to deny that, as a general rule, disclosure of defendants' trial strategies to plaintiffs would reveal information relevant to the case at issue.[6]

But Defendants assert that any information contained within the June 11th Agreement relating to Defendants' theories or strategies of defense is privileged under the work-product privilege as it applies through the common interest doctrine.  Rule 26(b)(3), Fed. R. Civ. P., codifies the work-product privilege, directing,

> . . . [A] party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering discovery of such materials when the required showing has been made, *the court shall protect against disclosure of the mental impressions, conclusion, opinions, or legal theories of an attorney or other representative of a party concerning the litigation* . . . .

(emphasis added).  Thus, opinion work product, as described in the portion of Rule 26(b)(3) emphasized above, is almost never discoverable.  *See United Kingdom v. U.S.*, 238 F.3d 1312, 1322 (11th Cir. 2001) (noting that opinion work product is "almost always protected from disclosure") (citations omitted).

---

[6]The Court recognizes that the June 11th Agreement by its terms pertains only to *Jeld-Wen I*, and Jeld-Wen seeks the Agreement for use in *Jeld-Wen II*.  For the reasons previously discussed in Section III.B.1, *supra*, however, the Court considers trial strategies regarding *Jeld-Wen I* to be relevant in the current case.

In reviewing paragraphs 2 through 7 and 9 of the June 11th Agreement, the Court finds that these provisions include Glasslam and Reichhold's mental impressions, conclusions, opinions, and legal theories for jointly defending the case against Jeld-Wen.  As Defendants correctly point out, the privilege applies with no less force simply because Glasslam and Reichhold made such disclosures to each other in the course of deciding their joint trial strategy against Jeld-Wen.  Under the common interest doctrine, "litigants who share unified interests [may] exchange . . . privileged information to adequately prepare their cases without losing the protection afforded by the privilege." *Visual Scene*, 508 So.2d at 440 (citing *Western Fuels Ass'n v. Burlington Northern Railroad Co.*, 102 F.R.D. 201 (D. Wyo. 1984)); *see also McNally*, 2001 WL 1246630, *2 (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989); *IBJ Whitehall Bank & Trust Co. v. Cory & Assoc., Inc.*, 1999 WL 617842, *3 (N.D. Ill. Aug. 12, 1999)).  The Court finds that with respect to the content of paragraphs 2 through 7 and 9, Defendants shared common interests at the time they entered into those provisions of the June 11th Agreement, and Defendants entered into the paragraphs at issue for the limited purpose of assisting in their common cause.  Additionally, the Court concludes that Defendants shared this information with the intention of maintaining its confidentiality.  Consequently, the common interest doctrine applies, and the work product privilege protects paragraphs 2 through 7 and 9 of the June 11th Agreement from disclosure.

## IV.  CONCLUSION

For the foregoing reasons, Jeld-Wen's Motion to Compel [D.E. 104] is **GRANTED IN PART and DENIED IN PART.**  Defendant Reichhold shall produce within five days of the entry

of this Order the June 11th Agreement, although it shall first redact paragraphs 2 through 7, and 9.

      **DONE AND ORDERED** this 11th day of March, 2008.

                                    ROBIN S. ROSENBAUM

                                    UNITED STATES MAGISTRATE JUDGE

cc:    Hon. William P. Dimitrouleas

       Counsel of Record