UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case Number: 07-cv-22326-DIMITROULEAS/ ROSENBAUM

JELD-WEN, Inc., an Oregon corporation,
individually and as assignee of the claims of
Cardinal IG Company, a Minnesota
corporation,

    Plaintiff,

v.

NEBULA GLASS INTERNATIONAL, INC.,
d/b/a "GLASSLAM" and "N.G.I., INC.," a
Florida corporation, and REICHHOLD, INC.,
a Delaware corporation, and STEPHEN
HOWES,

    Defendants.
_____/

## DEFENDANT GLASSLAM'S MOTION TO STRIKE PROPOSED EXPERT TESTIMONY OF DR. STEVE MARTIN AND MEMORANDUM OF LAW IN SUPPORT

Defendant Nebula Glass International, Inc. ("Glasslam"), pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), respectfully moves for an Order striking the proposed expert testimony of Dr. Steve Martin.

### INTRODUCTION:

1. On March 21, 2008, Jeld-Wen's proposed expert witness, Dr. Steve Martin, was deposed.

2. Although Jeld-Wen apparently wants Dr. Martin to opine on the ability of Steve Howes' patents to properly work, nothing in the deposition demonstrates that Dr. Martin has the qualifications to testify on this subject.

3. Dr. Martin acknowledged that nothing in the patents articulate that if windows are discolored, they do not function as intended. Furthermore, Dr. Martin also agreed he may not

1

have chosen the proper criteria to determine whether the glass windows functioned as specified in the patents. Thus, he is not competent to testify that the windows did not work in the manner described in the patents.

4.  Additionally, it appears Jeld-Wen seeks to utilize Dr. Martin to testify that, after sampling one window, all of the windows in Jeld-Wen's possession are discolored, and that because they are so, they do not work. However, the deposition does not reveal how he is qualified or competent to offer specialized knowledge on this topic. Although he has taught on the subject of glass and although he has read literature on glass manufacturing, there is no indication Dr. Martin is competent to proclaim that windows that are discolored do not work well, whether specified in a patent or otherwise.

5.  Furthermore, Dr. Martin's proposed testimony must be stricken because there are glaring contradictions between his area of purported expertise within his testimony and that offered in his Expert Report. While he acknowledged in his testimony that he has not investigated resins and that he has no opinion on whether the resin utilized in this case may have been "bad," his Expert Report is filled with opinions on the quality of the resin, its lack of stability, its photo-degradation, and its role in causing discoloration of the laminated glass windows in Jeld-Wen's possession. While Glasslam can only surmise that parts of the Report may have been written by persons other than Dr. Martin, it is significant for purposes of this motion that Dr. Martin's qualifications and competency cannot be expanded beyond his own self-admitted limitations.

6.  Separately, Dr. Martin's proffered testimony must be excluded since it will not assist the jury on topics that either lay witnesses can testify to, or is within the common knowledge and experience of the jury. Dr. Martin's belief that windows that are discolored do not work was not attributed to any scientific, technical, or specialized expertise, and the Plaintiffs and their

customers may argue to the jury that discoloration is a signal of failure to work. Furthermore, the capability of the windows to work or not work, based on this discoloration, is an ultimate determination for the jury to decide, rather than presented through purported expert testimony.

7. Finally, the Defendants have previously conceded that some windows may turn yellow, and that some of the resin received by the Plaintiffs was defective. Whether the Plaintiffs' windows failed to "work" based on discoloration caused by this resin cannot be adequately explained by Dr. Martin. His testimony will not be helpful to the trier of fact.

WHEREFORE, Defendant Glasslam respectfully requests that this Court strike the proposed expert testimony of Dr. Steve Martin, as he is not qualified to testify competently on the functionality of glass windows, is not qualified to testify that the applicable patents did not work properly, and because his testimony will not be helpful to the jury.

## **MEMORANDUM OF LAW**

Federal Rule of Evidence 702 lays out the circumstances in which expert testimony is admissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

District courts, in determining the admissibility of proposed expert scientific testimony, must scrupulously undertake a rigorous three-part inquiry to determine whether the proponent of the expert testimony establishes that "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).

*Daubert* imposes on the district courts the responsibility to act as "gatekeepers," charged with the duty to ensure that expert testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert*, 509 U.S. at 589; *Finestone v. Florida Power and Light Co.*, Slip Copy, 2008 WL 863894, at *5 (11th Cir. Apr. 5, 2008) (noting that pursuant to Rule 702, *Daubert* and its progeny, district courts must act as "gatekeepers" in determining whether to allow expert testimony). Critically, the proponent of the expert testimony carries a "substantial burden" to lay the proper foundation, and prove that this testimony satisfies the qualification, reliability, and helpfulness tests for admission into evidence. *Cook*, 402 F.3d at 1107 (emphasis added).

**I.  Dr. Martin is not qualified to testify competently regarding the matters he intends to address.**

Jeld-Wen has failed to cross through the first factor in the rigorous three-part test, as Dr. Martin does not have the requisite qualifications to testify that a window that may be discolored does not work very well, which is the principal assistance his testimony could provide. Further, to the extent Dr. Martin would opine that the applicable patents do not work well (because windows that are discolored cannot ever work well) he also lacks the competency to testify about this subject.

Dr. Steve Martin described himself as a "general scientist" in material science. (Ex. A, Dr. Martin Deposition, at 27; 52; 57). Although Dr. Martin knows he is not an expert in the manufacturing of laminated glass windows, he considers himself an expert on the materials utilized to making them. *Id.* at 57; 104.

Dr. Martin observed one laminated glass window provided by Jeld-Wen, but did not conduct any tests. *Id.* at 13. He reviewed the window and three patents held by the Defendants. P.14. Martin revealed this was the first case he has ever worked on regarding laminated glass, and he also has never worked on a case concerning resins or PET film that may be applied to glass. *Id.* at 35-36.

The purported basis for Dr. Martin's expertise was that he taught glass science and engineering for about twenty years. *Id.* at 114. Dr. Martin does not conduct scientific research or testing of laminated glass windows; rather he lectures about this subject. *Id.* at 37-39. He has never published any articles concerning glass windows. *Id.* at 38. Without this research or testing, Dr. Martin indicated he had read mostly peer-reviewed articles and glass textbooks to formulate his opinions. *Id.* at 77-78.

Dr. Martin stated that it "may be correct" that none of the journals, publications, or written information he relied on concerns the manufacturing of laminated glass. *Id.* at 114. He also searched the Internet to locate court summaries of rulings in other cases, to gain an understanding of the "general aspects" of this case. *Id.* at 79; 118. However, Dr. Martin acknowledged he did not know what he was reading in these court cases, as a non-legal person himself. *Id.* at 119.

Dr. Martin described his role and expertise in this case to address the "discoloration of laminated glass panes, windows." *Id.* at 26. In fact, he believed the main issue he focused on was

the discoloration issue, and he admitted he had no informed opinions concerning resin and whether it was manufactured properly in this case. *Id.* at 26-28; 85.

Although Dr. Martin stated that his report summarizes specific polymers and resins and stated that a window would experience photo-degradation without the appropriate polymers, he conceded that he was not capable of identifying the cause of window discoloration without viewing each particular window in question. *Id.* at 63-70. As noted, Dr. Martin was only provided one sample window. *Id.* at 70.

Dr. Martin also analyzed the effect of the patents to optical degradation of laminated glass. *Id.* at 47-48. Dr. Martin did not try to make a window or make laminated glass using the Defendants' patents, and thus his analysis of the patents was based on his review of literature and the patent documents. *Id.* at 94; 114. His role was to review the general engineering and scientific practice of the patent, to determine whether it would "work" in laminated glass. *Id.* at 93-94; 122-23.

More specifically, Dr. Martin explored whether a laminated glass window pane assembled according to the applicable patents "would function in all respects," by keeping out the weather elements, providing mechanical protection, and providing optical clarity. *Id.* at 123. According to Dr. Martin, if a window does not maintain transparency and clarity, then it does not work as a window but rather as a wall. *Id.* at 123-24. Dr. Martin also claimed that if the window fails to work in just one respect, then it does not work at all. *Id.* at 124. However, Dr. Martin had reservations that he had chosen the proper criteria to assess whether a laminated glass window works, (*Id.* at 124):

> Now did I choose the right ones? I don't know. Did I choose all of them? I don't know. Did I choose the best ones? I don't know. I just chose the ones I think made the most sense based on my

6

>expertise in glass and optical materials. So optical expertise, of course, is an important one.

When asked whether the Defendants' patents provide a definition of what "work" means, Dr. Martin asserted this was an "excellent question" and admitted the patents did not impose any requirements on performance as he had so classified. *Id.* at 124-25. Dr. Martin claimed that because the patents describe "functional performance," this necessarily provided a "laymen's word of working." *Id.*

Dr. Martin believed he has a general understanding of the teachings of a patent and could perform a scientific and engineering analysis of Howes' patents. *Id.* at 60; 126-27. However, Dr. Martin was not sure whether the teachings of patents are contained within the patent document. *Id.* at 127.

Thus, in summary, Dr. Martin is prepared to testify that:

- The patents did not "work" in the sample laminated glass he examined;
- The window did not "work" if it is discolored, even if it kept out weather elements and provides mechanical protection;
- Although he was unsure of the proper criteria to utilize when assessing whether a window "works," if a window fails in one respect, it does not work at all;
- The patents do not specify that the window would work according to Dr. Martin's admittedly uncertain classification of how any window should work;
- The patents' description of "functional performance" necessarily means that the window works, as Dr. Martin provided a definition of work; and
- Although windows experience discoloration without the appropriate polymers, Dr. Martin could not determine the cause of window discoloration without viewing each particular window.

*Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999), is analogous to the instant case, and demonstrates why Dr. Martin is not competent to testify that the Defendants' patents do not "work" or that windows which are discolored do not function properly. In *Noga*, in a copyright and trademark infringement action arising from a CD-ROM disc producer's unauthorized use of author's computer software program, the district court correctly refused to permit a proffered defense expert witness to testify as an expert on software licensing. The witness's knowledge and experience pertained to development, marketing, and licensing of commercial software used by individual banks, while the lawsuit involved distinct shareware and utility licensing fields, an area that was "totally distinguishable." *Id.* at 1302-03. Thus, while the witness possessed scientific, technical, or other specialized knowledge, he was not qualified on the specific subject of his proposed testimony. Although the expert was familiar with the broad area of "software," the rigorous requirement of *Daubert* had not been satisfied.

Similarly, in *Increase Minority Participation by Affirmative Change Today of Northwest Florida, Inc. (IMPACT) v. Firestone*, 893 F.2d 1189 (11th Cir. 1990), the Eleventh Circuit also rejected the proposed expert testimony on the rationale that the expert was not qualified to testify on the intended matters. The plaintiff brought an employment discrimination suit, and a proposed expert wanted to present evidence regarding statistical disparity between employment actions taken in favor of black applicants as against those taken in favor of whites. This expert however was neither a statistician nor an economist, but was a political scientist. *Id.* at 1195.

Dr. Martin's proffered testimony also falls well short of meeting this stringent test of competency. As noted, he is apparently prepared to testify that a window that is discolored does not work well. Yet he did not reveal how he was able to reach this conclusion, and while he has read literature and taught on the subject of glass windows for over twenty years, Dr. Martin did

8

not explain why it must *ipse dixit* mean that discolored window = non-functioning window. The fact he holds himself out as an expert in glass-making materials does not mean he is competent to testify, as an expert, that windows, and specifically Jeld-Wen's windows, failed to work because they were not transparent.

Additionally, while Dr. Martin apparently will testify that the patents did not work, he conceded that he is unsure of the correct criteria to utilize in making this assessment. While he "thought" that he selected the sensible factors, he expressed self-doubt that he had chosen "the right ones." A proffered expert who raises his own red flags could hardly be able to pass through the stringent requirements he must meet to this Court's satisfaction. Though Dr. Martin also believed that a window must protect from inclement weather, be sound mechanically, and not turn yellow, he did not articulate how he was able to determine that <u>all</u> of these factors must be satisfied. Of course, because he was not clear on which criteria had to be met, it is obvious that his belief that all three of these factors had to be met is fundamentally flawed.

Finally, Dr. Martin was unable to opine whether the patents specify that they must be free of discoloration in order to "work." Thus, on the subject he was purportedly most knowledgeable about, he could not opine that the patents did not work, as their written words conveyed. His testimony that the windows do not work when they turn yellow, and his testimony that the patents would only work if the windows did not turn yellow, was an area he was not competent to testify about.

**II.      The proffered testimony is inadmissible because Dr. Martin has admitted that his qualifications are far narrower than presented in his Expert Report.**

As noted above, Dr. Martin acknowledged he was not asked to assess whether the resins were manufactured properly, and he had no formal opinion on the chemicals used to make resin. Ex. A, Dr. Martin Deposition, at 27-28; 52. Other than his familiarity with the types of UV

9

absorbers that are added for use in laminated glass panels, he has no expertise concerning resin. *Id.* at 52. Dr. Martin also agreed he has barely, if at all, investigated resin in his career. *Id.* at 36. Similarly, while Dr. Martin's notes reflect he may have been informed by Plaintiffs' counsel that "bad" resin had been fraudulently supplied, he testified that he had not discovered that the resin was of poor quality, and further, that he had not been asked to investigate this issue. *Id.* at 85.

While an expert's own view of his or her expertise should be expected to be the ceiling of competency, Dr. Martin's report dramatically expands his purported areas of expertise. Apparently transforming himself into an expert on the resin used in this case, his Report opines that: (Ex. B., Dr. Martin Report, at pp. 26-29)[1]:

- The patents do not teach that a UV absorber is used to protect the PVB resin;
- PVB resin is unstable against UV light exposure;
- PVB resin must be protected from UV photo-degradation by using TINUVIN 328 at 0.2% weight;
- Prolonged exposure to the UV light contained in sunlight will cause the resin to photo-degrade, which in turn will cause a loss of optical quality;
- The adherent PVB resin in the laminated glass window will fail under UV light induced photo-degradation;
- When the resin photo-degrades, this will lead to discoloration of the laminated glass window and loss of optical quality;
- Resin photo-degradation will also lead to mechanical weakening of the laminated glass pane, which will lead to failure if the window is exposed to forces it originally was designed to withstand in rigid impact tests;

---

[1] The report was referred to and listed as Exhibit 2 in Dr. Martin's Deposition.

- The windows could not pass accelerated sunlight tests because the unprotected PVB resin would photo-degrade.

It is impossible to reconcile Dr. Martin's deposition testimony with these written opinions. A witness who has never investigated resin, who was not asked to investigate the chemicals or manufacturing of resin, who admitted he had no formal opinions on this topic, who never investigated whether the resin was good or bad, and whose only role in examining resin was to focus on differences regarding the choice of a UV absorber, cannot be capable of offering the detailed opinions within the report concerning the weakening of resin. Under these circumstances, Dr. Martin is not competent or qualified to testify as an expert.

Although Glasslam cannot prove why or how the report so sharply diverged from Dr. Martin's own testimony, it is possible that Dr. Martin did not author all of the conclusions offered in the report. He conceded that he had discussions with Plaintiffs' counsel, that phrases had been eliminated following these discussions, and that the report had been "co-written" with counsel. Ex. A, at 95-98. Dr. Martin agreed for example, that the last paragraph of the Report, citing to a federal circuit opinion that discusses the factors court utilize when determining the level of ordinary skill in the art, had been provided by counsel. *Id.* at 97-99. Further, Dr. Martin agreed he had not read this court opinion. *Id.* at 101.

More significant than whether Dr. Martin wrote and read what was submitted in his report is that he is not qualified or competent to testify that resin in windows becomes weaker, fails, and photo-degrades. He revealed in his deposition that he is not qualified or competent to testify on this subject, and this Court should not ignore an expert's own assessment of his or her own qualifications.

11

**III.    The proffered testimony is inadmissible because it is within the common experience of the jury.**

As noted above, a party seeking to introduce expert testimony must carry its substantial burden to prove all three factors of the *Daubert* test have been satisfied. *See Cook*, 402 F.3d at 1107. Jeld-Wen has also failed to meet the third factor, because Dr. Martin's testimony will not assist the jury through the application of scientific, technical, or specialized expertise, and he will not assist the jury in understanding the evidence or determine any fact in issue.

This third factor is known as the "helpfulness to the trier of fact" test, and expert testimony must concern matters beyond the understanding of the average lay person. *Cook*, 402 F.3d at 1110-11. This test is far more stringent than the relevancy analysis applied to ordinary evidentiary matters, as district courts must ensure that the proposed expert testimony logically advances a material aspect of the proposing party's case. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

For example, in *Cook*, the Eleventh Circuit upheld the trial court's decision to exclude a plaintiff's proposed expert who failed to present specialized knowledge not within the general understanding of the jury. The proposed expert, who the plaintiff characterized as an expert in suicide prevention in prison facilities, was prepared to testify that the Sheriff had failed to prevent a prisoner's suicide, that the appropriate policies and procedures would have alerted the Sheriff to the high suicide rate in the facility, and that the Sheriff was deliberately indifferent to the plaintiff's medical needs. 402 F.3d at 1108-09.

The Eleventh Circuit went through ten different findings in the expert's report, and concluded all ten were properly excluded. *Id.* at 1111-13. As one example, the Court noted that while the proposed expert opined that the prison facility failed to identify the plaintiff's suicidal tendencies, this, (*Id.* at 1111):

12

> arguably involves no "scientific, technical, or other specialized knowledge," Fed.R.Evid. 702, and offers nothing "beyond the understanding and experience of the average citizen," *Rouco*, 765 F.2d at 995. The testimony of the three MCDC deputies makes abundantly clear that the MCDC failed to detect that Tessier was suicidal. Accordingly, the trial court acted within its discretion in determining that expert testimony to this effect was not appropriate.

None of the ten areas of the report were helpful, because the topics were within the general understanding of the jury. Furthermore, plaintiff's counsel could argue what the proper procedures and policies should have been, and could also argue that based on a high suicide rate, the Sheriff should have been on notice and taken action to prevent the plaintiff's suicide. Id. at 1108-13.

Similarly, in *Hibiscus Associates Ltd. v. Board of Trustees of Policemen and Firemen Retirement System of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995), the Eleventh Circuit upheld the district court's decision to exclude expert testimony, because it was not needed to clarify facts and issues, a common understanding of which jurors were able to comprehend for themselves. As the Court added, the proposed testimony: (*Id.*):

> the Fund proffered [was] that Dowling would express his opinion that a "final unconditional certificate of occupancy" was not received and, therefore, under the terms of the loan, it had not converted from a construction to a permanent loan. Witnesses for both the Fund and the Guarantors had already testified to the existence of various certificates of completion and occupancy.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998) reveals the district court's role in this helpfulness test. There, the proffered testimony of a certified public accountant in an action based on antitrust and fraud claims, which calculated, compiled and explained costs borne and profits enjoyed by chemical distributors during an alleged conspiracy to fix prices of chlorine sold to municipalities, was sufficient to assist the trier of fact to

13

determine whether the distributors acted in a consciously parallel fashion and whether their costs impelled price increases. *Id.* at 563-64.

However, a proffered expert statistician's assertions regarding the existence of a conspiracy in general, and his characterization of certain bids by chemical distributors as "signals" to co-conspirators in particular, were outside of his competence as an expert. *Id.* at 565. The trier of fact was capable of determining whether to draw such conclusions without technical assistance from experts. *Id.*

In the instant case, Dr. Martin's proposed testimony will not be helpful in assisting the trier of fact. His opinion that windows that are discolored do not work properly is not something that the jurors need or would be aided in hearing from expert testimony. Based on their own experiences, the jurors can evaluate whether the windows had other useful purposes, and whether a window that is discolored can still work. Dr. Martin's personal opinion that yellow windows fail to properly work adds nothing to this case.

To the extent that lay citizens would believe that a window that is discolored does not work, this is something within the common ordinary experience of the trier of fact. Jeld-Wen will certainly be able to argue to jurors that the windows did not work precisely because of a lack of transparency, just as the plaintiff's attorney in *Cook* could argue that the Sheriff should have implemented safety procedures to prevent prisoner suicides.

Dr. Martin's testimony on the functionality of the patents is also unhelpful. Beyond his own personal beliefs, he also felt that based on his knowledge and expertise on the teachings of patents, the Howes' patents did not work because windows turned yellow. However as noted above, Dr. Martin was not convinced he utilized the pertinent factors to assess whether a window works, and he agreed that the patents did not specify that there would be a lack of discoloration.

14

As also noted, to the extent Dr. Martin believed the patents did not work because resin will become weaker, he admitted he was not qualified to testify on this subject. Thus Dr. Martin's testimony will be of little if any help to the jury.

Additionally, because lay witnesses (including Jeld-Wen customers) can testify that their windows were discolored and that they may believe this was a signal that the windows did not "work," Dr. Martin's testimony will not aid or clarify any facts or issues. His purported expertise on what working means cannot supersede or even complement the subjective beliefs of the users of the product.

## CONCLUSION

Defendant Glasslam respectfully requests that this Court strike the proposed expert testimony of Dr. Steve Martin.

## **CERTIFICATE OF PRE-FILING CONFERENCE**

Pursuant to S.D. Fla. L. R. 7.1(A)(3), counsel for Glasslam has conferred with counsel for Jeld-Wen, who does not agree with the instant motion.

BURLINGTON & ROCKENBACH, P.A.
By:     s/Bard D. Rockenbach
Bard D. Rockenbach (Fla. Bar No. 771783)
bdr@flappellatelaw.com
Attorneys for Defendants, NEBULA GLASS and
STEPHEN HOWES
2001 Palm Beach Lakes Blvd., Suite 410
West Palm Beach, FL 33409
(561) 721-0400 phone; (561) 721-0465 fax

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case Number: 07-cv-22326-DIMITROULEAS/ ROSENBAUM

JELD-WEN, Inc., an Oregon corporation,
individually and as assignee of the claims of
Cardinal IG Company, a Minnesota
corporation,

    Plaintiff,

v.

NEBULA GLASS INTERNATIONAL, INC.,
d/b/a "GLASSLAM" and "N.G.I., INC.," a
Florida corporation, and REICHHOLD, INC.,
a Delaware corporation, and STEPHEN
HOWES,

    Defendants.
_____/

Certificate of Service

    I hereby certify that on April 7, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                              s/Bard D. Rockenbach
                              Bard D. Rockenbach

## **SERVICE LIST**

Jeld-Wen, Inc. v. Nebula Glass International, Inc. et al.
Case Number: 07-cv-22326-DIMITROULEAS/ ROSENBAUM
United States District Court, Southern District of Florida

**Sanford Lewis Bohrer**
Holland & Knight
701 Brickell Avenue
Suite 3000
Miami, FL 33131
305-789-7678             representing        **Reichhold, Inc.**
679-6335 (fax)                               *(Defendant)*
sbohrer@hklaw.com

**Kimberly Lynn Boldt**
Alters, Boldt, Brown, Rash & Culmo, P.A.
21 S.E. 5th Street, Suite 200
Boca Raton, FL 33432
561-955-0045             representing        **Nebula Glass Int'l, Inc.**
955-1978 (fax)                               *(Defendant)*
Kimberly@abbrclaw.com

**Louis Robert Bourgeois**
Fowler White Boggs Banker
501 E. Kennedy Boulevard
Suite 1700 P.O. Box 1438
Tampa, FL 33602
813-222-1136             representing        **Jeld-Wen, Inc.**
229-8313 (fax)                               *(Plaintiff)*
bbourgeois@fowlerwhite.com

**Mark D. Folk**
Fowler White Boggs Banker
501 E. Kennedy Boulevard
Suite 1700 P.O. Box 1438
Tampa, FL 33602
813-222-1136             representing        **Jeld-Wen, Inc.**
229-8313 (fax)                               *(Plaintiff)*
mfolk@fowlerwhite.com

**Susan M. Glenn**
Nelson Mullins Riley & Scarborough
1320 Main Street
Meridian Suite 1700
Columbia, SC 29201          representing          **Jeld-Wen, Inc.**
803-255-9405                                      *(Plaintiff)*
susie.glenn@nelsonmullins.com

**Jeffrey L. Goodman**
Goodman & Associates PC
P.O. Box 12091
Des Moines, IA 50312
515-267-8600               representing          **Jeld-Wen, Inc.**
515-224-2075 (fax)                                *(Plaintiff)*
jeff@gdmnlaw.com

**John David Heffling**
Williams & Heffling
316 Banyan Boulevard
P.O. Box 4118
West Palm Beach, FL 33402
561-659-3500               representing          **Nebula Glass Int'l, Inc.**
655-3158 (fax)                                    *(Defendant)*
JHeffling@WilliamsHeffling.com

**Amy Lane Hurwitz**
Carlton Fields
100 S.E.2nd Street
Suite 4000 P.O. Box 019101
Miami, FL 33131-9101       representing          **Reichhold, Inc.**
305-530-0050                                      *(Defendant)*
530-0055 (fax)
ahurwitz@carltonfields.com

**Gretchen R. Jensen**
Goodman & Associates PC
P.O. Box 12091
Des Moines, IA 50312
515-267-8600               representing          **Jeld-Wen, Inc.**
515-224-2075 (fax)                                *(Plaintiff)*
gretchen@gdmnlaw.com

**Stephen G. Morrison**
Nelson Mullins Riley & Scarborough
1320 Main Street
Meridian Suite 1700
Columbia, SC 29201          representing          **Jeld-Wen, Inc.**
803-255-9405                                       *(Plaintiff)*
steve.morrison@nelsonmullins.com

**Benjamine Reid**
Carlton Fields
100 S.E.2nd Street
Suite 4000 P.O. Box 019101
Miami, FL 33131-9101        representing          **Reichhold, Inc.**
305-530-0050                                       *(Defendant)*
530-0055 (fax)
breid@carltonfields.com

**Bard D. Rockenbach**          representing          **Nebula Glass Int'l Inc.**
Burlington & Rockenbach, P.A.                       and
2001 Palm Beach Lakes Blvd., Suite 410              Stephen Howes
West Palm Beach, FL 33409                           *(Defendant)*
(561) 721-0400 phone
(561) 721-0465 fax
bdr@flappellatelaw.com

**Christina M. Schwing**
Holland & Knight
50 North Laura Street
Suite 3900
Jacksonville, FL 32202
904-353-2000                representing          **Reichhold, Inc.**
358-1872 (fax)                                     *(Defendant)*

**Richard N. Sieving**
Sieving & Momjian LLP
901 H Street
Suite 601
Sacramento, CA 95814-1809
916-444-3366                representing          **Jeld-Wen, Inc.**
444-1223 (fax)                                     *(Plaintiff)*

**Robert Troy Smith**
Holland & Knight
50 North Laura Street
Suite 3900
Jacksonville, FL 32202
904-353-2000             representing     **Reichhold, Inc.**
358-1872 (fax)                            *(Defendant)*
troy.smith@hklaw.com

**Louis L. Williams**        representing     **Nebula Glass Int'l, Inc.**
Williams & Heffling                              and
316 Banyan Boulevard                         Stephen Howes
West Palm Beach, FL 33401                   *(Defendant)*
561-659-3500
655-3158 (fax)
lwilliams@williamsheffling.com